**SIGNED THIS: March 08, 2011**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| BERWICK BLACK CATTLE COMPANY, | ) | No. 06-82166 |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | |
| MARK RAY, | ) | No. 06-82165 |
| Debtor. | ) | |
| | ) | |
| DONALD KNISS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 08-8090 |
| | ) | |
| MARK RAY, BERWICK BLACK CATTLE | ) | |
| COMPANY and HIGH PLAINS FARM | ) | |
| CREDIT, PCA, | ) | |
| Defendants. | ) | |
| | ) | |
| MARK RAY and BERWICK BLACK | ) | |
| CATTLE COMPANY, | ) | |
| Cross-Claimants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HIGH PLAINS FARM CREDIT, PCA, | ) | |
| Cross-Defendant. | ) | |

**O P I N I O N**

This matter is before the Court for decision after trial on the Amended Complaint filed by Donald Kniss (KNISS), against the Debtors, Mark Ray and Berwick Black Cattle Company (individually as "RAY" and "BERWICK;" together, the "DEBTORS") and High Plains Farm Credit, PCA (HIGH PLAINS), for claims arising out of a court-approved agreement for the sale of the DEBTORS' cattle to KNISS.

**BACKGROUND**

While the following provides a basic outline of the factual and procedural context of this matter, the details of the evidence will be set forth in the analysis of the issues before the Court. The DEBTORS were in the business of buying, selling and raising cattle. The nature and substance of the cattle business conducted by RAY and by BERWICK were, for all relevant purposes, operated as a single enterprise. Involuntary Chapter 11 petitions were filed against them on December 25, 2006. The DEBTORS did not contest the petitions and orders for relief were entered on February 1, 2007. As a condition to providing postpetition Debtor-in-Possession financing, HIGH PLAINS, the DEBTORS' primary secured lender, required the DEBTORS to liquidate the 16,500 head of cattle owned as of the petition date. Systematic sales ensued, both in the ordinary course of business and outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code. HIGH PLAINS, as the senior secured lender, received the bulk of the proceeds from the sale of cattle.

On September 7, 2007, the DEBTORS and KNISS entered into an agreement for the sale of 2,610 head of cattle and related calves, subject to Bankruptcy Court approval. On

September 20, 2007, the DEBTORS filed a motion seeking approval of the sale to KNISS. The agreement listed twenty-eight separate locations or pens for the cattle, identified the number of cattle counted at each location and fixed a per head value for each location. A cryptic description of the cattle was listed for each location.[1]

According to the terms of the contract, KNISS was to pay a total "Base Amount" of $2,999,650, for the 2,610 head. In addition, the agreement provided for a profit-sharing arrangement between KNISS and the DEBTORS as to cattle which RAY would identify as having "extra value" during the sorting process and which would be offered for resale to third parties. From the sale of the extra value cattle, KNISS would be entitled to receive the base price plus the first $100 per head in excess of the base price, with any additional proceeds to be divided 50/50 between KNISS and the DEBTORS. The contract requires KNISS to make an advance payment of $250,000, which would be used to cover the last cattle loaded on to KNISS' trucks. KNISS was required to pay the base amount for each location, via wire transfer to the DEBTORS' account, prior to loading any cattle. KNISS agreed to pay the ordinary feed and care expenses in connection with the cattle prior to resale, except that the DEBTORS were required to pay the ordinary carrying costs for cattle that were not sold for more than the base price, as well as extraordinary expenses such as photography, clipping or grooming incurred in connection with the extra value cattle. Either KNISS or subsequent purchasers were responsible for paying the trucking expenses.

---

[1] Twelve of the locations were described as "All pairs," and four of the locations were described as "Fall calvers." One of the locations identified 67 cows and listed "48 calves." Another location identified 277 cows and listed "210 calves bred and open."

3

A hearing on the motion for approval of the sale to KNISS was held on September 28, 2007, and an agreed order approving the sale was entered on October 4, 2007. The order provided, in part:

> 20. Prior to releasing any Cattle, the Debtors will confirm that payment of the Base Amount for the respective set of Cattle is paid via wire transfer into Debtors' sale proceeds account (Payee Name: Berwick Black Cattle Co. Sale Proceeds Account: 551814046; ABA: 101000019) and honored. All Sale Proceeds shall be remitted to High Plains in accordance with the provisions of the Extended Final Order and this Order.
>
> 21. The Debtors, in conjunction with Kniss, will maintain records of transactions relating to the sale and resale of the Cattle, including the purchase price for each cow and bull sold (or the purchase price for each group of cattle sold if they are not sold individually) and Cattle identification wherever possible, and will provide such information to counsel for the Committee as soon as practicable.

The order provided that the Bankruptcy Court would retain jurisdiction to enforce the sale agreement and to resolve any disputes relating to the sale of the cattle to KNISS.

KNISS arrived at RAY'S farm in Illinois in October, 2007. He and RAY began the process of sorting, separating, and loading up the cattle for transport back to Oklahoma, a process which continued throughout the month of November, winding up in the first week of December, 2007. The cattle from each location were herded and led to the main barn, where the cows were run through a chute and logged by identifying information, either by ear tag numbers or an electronic ID tag. As the cattle passed through the chute, RAY identified those which he believed would bring extra value, and those were separated out for sale to certain buyers. In most instances, the buyers had been contacted by RAY and were present at the time of the sorting. Not all of the calves were run through the chute. KNISS explained that after calves were born, they were given an ear tag with the same number as the mother cow.

4

From the outset, the terms of the agreement were not strictly observed. While KNISS made the advance payment of $250,000, he did not pay the base amount for the cattle as they were sorted and prior to their being shipped. RAY and KNISS, both sophisticated cattlemen, modified the agreement to accommodate their needs as the transaction progressed. Proceeds from the sale of the extra value cattle, which numbered 612, were collected in the total amount of $1,268,950.

In early December, 2007, prior to loading up the final shipment of cattle to Oklahoma, KNISS met with the DEBTORS' bookkeeper, Susan McSperitt (McSPERITT), in order to determine the final amount due. After initially agreeing that KNISS was entitled to receive payment of $91,697.79 under the contract, RAY issued a check to KNISS in that amount and KNISS returned to Oklahoma. Upon review of McSPERITT'S calculation, RAY determined that it was incorrect and stopped payment on the $91,697.79 check issued to KNISS. Based on his recalculation, RAY sent KNISS a check in early January, 2008, for $50,710.13. Because he disputed that amount, KNISS did not cash the check.

The DEBTORS filed a joint plan of reorganization on January 28, 2008 and a Disclosure Statement on February 29, 2008. Although the plan received the requisite approval by creditors, confirmation of the plan was denied based upon inappropriate third-party release provisions contained in the plan and the bankruptcy cases were dismissed on January 15, 2009. An appeal was taken from the orders dismissing the cases and the dismissals did not become final until April 1, 2010. [2]

---

[2] The decision of the district court affirming this Court's dismissal, was vacated on appeal to the Seventh Circuit Court of Appeals, based on lack of standing. *In re Mark Ray*, 597 F.3d 871 (7th Cir. 2010). An order was entered on April 1, 2010, dismissing the bankruptcy appeals on the mandate of the Seventh Circuit.

5

While the cases were pending, on June 30, 2008, KNISS filed this adversary proceeding against the DEBTORS, for breach of the sale agreement and requested that the Court resolve the disputes that had arisen between the parties. KNISS acknowledged that he may owe the DEBTORS an amount for feed bills which the contract required him to pay. In their answer to the complaint, the DEBTORS raised the affirmative defense of setoff, claiming that they were owed at least $43,202.20 for cattle carrying costs and that they were entitled to offset that amount against the claims asserted by KNISS. After the cases were dismissed, the DEBTORS' attorneys were permitted to withdraw. Because the sale to KNISS had taken place with approval of the Bankruptcy Court and the sale proceeds had been paid over to HIGH PLAINS subject to disgorgement, the Court exercised its discretion to retain jurisdiction to resolve the parties' dispute, despite the dismissal of the underlying bankruptcy proceedings. KNISS filed an amended complaint, adding a count for disgorgement and HIGH PLAINS was added as a Defendant. The DEBTORS, with the assistance of their original counsel, answered the amended complaint and asserted a cross claim against HIGH PLAINS for disgorgement of any amounts which the DEBTORS are determined to owe KNISS.

The matter was tried on January 20 and 21, 2011. KNISS, an experienced rancher residing in Oklahoma, testified that he became aware that the DEBTORS planned to sell their livestock and traveled to Illinois in August, 2007, to inspect the cattle. He returned in October, 2007, after the sale was approved by the Court, and remained until the first week in December, spending nearly every day at RAY'S property, assisting with the sorting of the cattle and loading them on to his trucks.

6

While admitting that there was no practical way to accurately count the number of calves born from the cows which he purchased from the DEBTORS, KNISS testified that based on the contract, he expected to receive 407 more calves than he did. To KNISS, the term "all pairs," a description utilized in the contract, indicates that each cow had one calf. KNISS testified that he received 115 "wet bag cows," which did not have calves by their side. He explained that a "wet bag cow" is one that has recently been nursing a calf.

KNISS also testified that when the extra value cattle were sorted for sale to Diamond L Ranch, he observed that 22 of the calves which were included bore ear tags that matched cows which he had shipped to Oklahoma. He took photographs of the calves which belonged to his cows. KNISS acknowledged that he ultimately agreed to the sale to Diamond L Ranch, because he was advised that the deal would not be completed if he did not agree and he was anxious to return home. According to KNISS, an unusually high number of calves died during the sorting and sale process from October to early December. He estimated that 100 calves died. He testified that a death loss of 2 to 3% would be normal if the cattle were properly maintained.

In support of his claims, KNISS offered the testimony of Terry Vigil, who also purchased cattle from the DEBTORS. According to Vigil, many of the cows which he expected to be pregnant were not. In addition, many had calves at their side when he inspected the cattle, but those calves were missing when he loaded them up. Vigil considered the management of the cattle operation to be poor and confirmed that there was an unusually high death loss of calves. Shane VanZant, a marketer of premium livestock, who resided in Oklahoma and had brokered the sales between KNISS and Vigil and the

7

DEBTORS, also affirmed the lack of care given the calves and the excessive death loss.

RAY testified that he has been in the cattle business for thirty-three years, specializing in extra value cattle. His particular market was the sale of extra value breeding cattle and show cattle. RAY disagreed with KNISS' interpretation of the contract term "all pairs," contending that it meant that the cattle in that location, having been bred, had the opportunity to have a calf by their side. He emphasized that there was no way to ever guarantee a 100% calf crop, explaining that extra value stock have joint and structure issues. He denied representing to KNISS that "all pairs" meant that each cow had a calf. While a shortage of cattle was not anticipated, the cattle numbers identified in the contract were by necessity approximations.

RAY admitted that the amount of dead calves in certain locations was higher than usual. RAY stated that an experienced stockman such as KNISS would be aware that the moving of the cattle at a time when many were heavy with calves would be chaotic and stressful, resulting in some calves being lost.

**ANALYSIS**

Both KNISS and RAY have extensive knowledge of the livestock industry in general and the buying and selling of cattle in particular. Despite their expertise, neither of the parties managed to maintain complete records as to the identification of the cattle for the base amount prices set forth in the original contract. As a result, RAY and McSPERITT determined that a blended rate based on the number of cows and the total purchase price set forth in the agreement, should be applied in calculating the price per head. Application of that formula results in a price of $1,149.29 per head.[3] Given the inability to separately

---

[3] That figure is computed by dividing $2,999,650 by 2,610.

price the livestock, at trial KNISS agreed that methodology was acceptable.

In addition, several other components of the reconciliation of the amount due KNISS have been agreed to by the parties. They agree that KNISS purchased 2,464 head of cattle, not taking into consideration the eleven head sold at Fairview. The parties agree that the total proceeds received from the sale of the 612 head of extra value cattle were $1,268,950 and that the total amount paid by or credited to KNISS is $3,127,775. They also agree that the amount owed by KNISS for feed is $43,202.20. KNISS' purchase of thirty-two cows, which were located in Kansas at $950/head, for a total of $30,400, is also not disputed.

The task before the Court is limited to resolving four discrete issues:

1.      Whether KNISS should be charged with the purchase of eleven cows which RAY claims remained behind when KNISS returned to Oklahoma;

2.      Whether KNISS is entitled to any damages on his claim of missing calves;

3.      Whether KNISS' claim that he did not agree to purchase nor did he in fact receive three bulls from the DEBTORS requires a further adjustment to be made to the tendered reconciliation; and

4.      Whether KNISS' share of the proceeds of the extra value cattle should be calculated based on the contract price or the blended rate.

**Eleven "Skinny" Cows**

RAY claims that after KNISS had returned to Oklahoma, he went through the pens and discovered eleven "skinny" cows: six cows in a pen with the bulls, two cows with "lumps and bumps" and three other cows which were of poor quality. According to RAY, he promptly advised KNISS, but he did not return his calls. He testified that KNISS had spoken with and advised one of his employees that he would pick the cattle up. When he did not, RAY stated that he hauled them to the Fairview Sale Barn to be sold because it was

9

not in anyone's best interest to keep feeding them, directing Fairview to send the sale proceeds to KNISS. RAY testified that he was advised by Fairview that KNISS had spoken to them.

KNISS denied that there were any cattle left behind when he went home to Oklahoma in early December, 2007. According to KNISS' testimony, he was unaware of the supposed problem until McSPERITT advised him that he would be receiving a check from Fairview for sale proceeds from eleven cattle that were discovered after his departure. KNISS admits that he received a check from Fairview for the net sum of $6,497.60, which he later cashed. KNISS offered at trial to turn the proceeds over to the DEBTORS.

KNISS admits that he did not drive through all the pastures before he returned home. Rather, his position that no cattle had been left behind is based on his confidence that the DEBTORS' employees would not have overlooked them in the first instance. KNISS maintains that it is not appropriate that he be charged the contract price for the eleven cattle because he never saw any remaining cattle. KNISS concedes that if he had known cattle had been left behind he would have sent them to auction. In fact, he testified that approximately 70 to 80 head of cattle that in his estimation would not bring a higher price back in Oklahoma had been sent to the sale barns in Galesburg or Fairview, in order to save on transportation costs.

The Court accepts RAY'S testimony that eleven cows remained behind and that those cows were part of the cattle which KNISS purchased under the agreement. Based on his own testimony, KNISS was anxious to return back home and made no inspection on his own. Accordingly, it is appropriate that KNISS also be charged the blended rate for those

eleven cows, or a total of $12,642.20. By his own admission, his disposition of the cattle would not have differed from that made by the DEBTORS, and he has suffered no harm.

**Missing Calves**

The contract provides for the sale of 2,610 cows. No bulls and no calves are included in that count. Calves are referenced in the column headed "Description," but are not counted except in the last three entries: "48 calves," "210 calves bred and open" and "Donors & 17 bucket calves."

Asserting that the DEBTORS breached the contract by failing to deliver the number of calves provided for, KNISS contends that he was shorted 258 calves.[4] In arriving at this number, he first makes an adjustment for the difference between the number of cows referred to in the contract of 2,610 and the number which he actually received of 2,464. That difference of 146 is subtracted from the number of calves which he considered to be referred to in the contract as 1,427. The latter figure is based on the cows which are described as "fall calvers" and as "all pairs," as well as calves which were separately listed. KNISS' interpretation of the description of "all pairs" was that each cow had a calf, insisting that a cow without a calf is not a "pair." Based upon his expectation of receiving 1,281 calves and the number of calves actually received of 1,023, KNISS claims a shortfall of 258 calves.

Approaching the issue from a different angle, KNISS attempted to quantify the actual loss of calves. KNISS attributes a loss of 20 calves to the cattle agistered by Brown,

---

[4]During his testimony, KNISS asserted that he was shorted 407 calves, based on the contract. This number was refined by his counsel in closing argument.

11

given RAY'S admission that a shortage in cattle resulted. Added to that figure are the 115 wet bag cows which were trucked back to Oklahoma and the 22 calves which KNISS claims were included in the sale to Diamond L Ranch. KNISS completes the tally by adding his estimate of 100 dead calves. As for the amount of damages, KNISS claims that he is entitled to a credit of $187,750, calculated as follows:

| | |
|---|---|
| 20 calves short @ Brown's @ $750/head | $ 15,000 |
| 115 wet bag cows @ $750/head | 86,250 |
| 22 calves sold to Diamond L Ranch @ $750/head | 16,500 |
| 100 dead baby calves @ $700/head | 70,000 |
| TOTAL | $187,750 |

KNISS testified that he had taken several photographs in order to keep a record of the cows and calves. One picture shows big black and big red calves which KNISS claims he did not receive. In his estimate, there were about twenty such calves that never made their way to the main pen for sorting but, he speculates, were sold off to someone else. KNISS did not record the ID numbers for the 115 wet bag cows. Nor does he have any specific documentation in support of his claim of 100 dead calves. In evidence is a photograph taken by KNISS which depicts a dead calf and cow.[5] KNISS testified that most of the calves that died were pastured on Brown's property. He did not put himself through the distasteful task of tracking the death loss by taking a photograph each time he discovered a dead calf.

The DEBTORS dispute KNISS' interpretation of the sale agreement, contending that the term "all pairs," ascribed to several of the locations of cattle listed in the agreement, did not mean that every cow would have a calf by her side. According to RAY, the description

---

[5] KNISS testified that each of the four pictures on Exhibit 11 were taken of the same cow and calf.

12

"all pairs" meant that the cows in that location had the opportunity to have a calf by their side, not that each of the cows was guaranteed to have a calf. He testified that the cows either had a calf by their side or had been bred. The DEBTORS point out the fallacy of KNISS' "count" of the missing calves, noting that the calves from the "wet bag" cows could have been the same calves which KNISS contends were sold to Diamond L Ranch or included in the other category of estimated dead baby calves.

It is a fundamental principle of law that a contract will be construed to give effect to the parties' intent, which is to be determined from the language of the contract. *Virginia Sur. Co., Inc. v. Northern Ins. Co. of New York*, 224 Ill.2d 550, 866 N.E.2d 149 (2007). The agreement should be interpreted as a whole, viewing each provision in light of the others. *Gallagher v. Lenart*, 226 Ill.2d 208, 874 N.E.2d 43 (2007). If the terms of the agreement are unambiguous, the parties' intent is ascertained solely from the contract language, giving the words their plain and ordinary meaning. *Virginia Sur. Co.,* 224 Ill.2d at 556. The terms of a contract should be interpreted in accordance with the custom and usage of those terms in the parties' industry or trade and the terms need not be found ambiguous before such evidence can be considered. *Intersport, Inc. v. National Collegiate Athletic Ass'n*, 381 Ill.App.3d 312, 885 N.E.2d 532 (Ill.App. 1 Dist. 2008).

Where an ambiguity exists, parol or extrinsic evidence may be considered to interpret the contract. *Pepper Const. Co. v. Transcontinental Ins. Co.*, 285 Ill.App.3d 573, 673 N.E.2d 1128 (Ill.App. 1 Dist. 1996). If ambiguous, the interpretation of a term is a question of fact. *Quake Const., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 565 N.E.2d 990 (1990). A contract term is considered ambiguous if it is "susceptible to more than one meaning . . .

13

or is obscure in meaning through indefiniteness of expression." *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill.App.3d 234, 931 N.E.2d 780 (Ill.App. 1 Dist. 2010).

The contract, cryptic in some respects, fails to define the term "all pairs." RAY and KNISS, both well-experienced in the industry, disagree about its meaning. It is apparent that the term "all pairs" is a term of art in the cattle industry. Expert opinion testimony is admissible to clarify or define a term of art used in a contract. *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir. 1997). No independent expert testimony was offered.

Without independent expert guidance, the Court is left with simply evaluating the competing testimony of RAY and KNISS. The Court finds RAY'S testimony to be more detailed and more credible on this point. His statement that there is no guarantee of every cow having a calf by her side comports with common sense. Cows don't always get pregnant, pregnancies don't always result in live births, newborn calves don't always survive. The Court determines that the term "all pairs" means each cow may, not must, have a calf at her side. So the fact that all of the cows located in each pen designated "all pairs" did not have a calf is not necessarily a breach of the contract.[6]

Even accepting RAY'S interpretation of the contract that KNISS was not being sold a fixed number of calves, there remains the issue of whether KNISS is entitled to damages for his claim that an unusually high number of baby calves died during the sale process. Under Illinois law, the proper measure of damages for breach of contract is the amount of

---

[6] If none of the cows had calves, breach (or perhaps mutual mistake) seems obvious. Just what percentage of "all pairs" cows without a calf is permissible is an unanswered question. The parties did not attempt to draw that line, so neither will the Court.

14

money that will place the injured party in the position he would have been in had the contract been performed, but not in a better position. *Equity Ins. Managers of Illinois, LLC v. McNichols*, 324 Ill.App.3d 830, 755 N.E.2d 75 (Ill.App. 1 Dist. 2001). The burden is on the plaintiff to prove that he sustained damages resulting from the breach and to establish a reasonable basis for computation of those damages. *Midwest Software, Ltd. v. Willie Washer Mfg. Co.*, 258 Ill. App.3d 1029, 630 N.E.2d 1088 (Ill.App. 1Dist. 1994). An award of damages cannot be based on speculation and conjecture. *Kohlmeier v. Shelter Ins. Co.*, 170 Ill.App.3d 643, 525 N.E.2d 94 (Ill.App. 5 Dist. 1988).

KNISS failed to prove that he was entitled to receive a certain or minimum number of calves under the contract so his claim of breach for lack of calves must fail. The counts in the contract were clearly treated as estimates by the parties, to be adjusted upon loading. KNISS was on-site and personally overseeing the loading process from beginning to end. The time to reject nonconforming cattle was at the point of loading. By accepting the cows with or without calves and by not implementing a procedure to count and match up calves with their mother cows, KNISS accepted the animals as loaded and lost the opportunity to now contend that he didn't receive what he was due.[7] With respect to the allegation that some of KNISS' calves were transferred to Diamond L Ranch, KNISS admitted that he expressly approved that transaction and received the benefit of the proceeds paid by the buyer. By his own approval and acceptance of the benefit, KNISS is estopped from now claiming the transaction violated his contract rights and caused him a loss.

**Sale of Bulls**

---

[7] A buyer accepts goods when after a reasonable opportunity to inspect them, he fails to reject them. 810 ILCS 5/2-606.

15

RAY maintains that, in addition to the cows, KNISS purchased three bulls for $15,000. KNISS denied that he purchased any bulls, testifying that he purchased one bull from RAY for $1,000, giving a check for that amount to McSPERITT. According to KNISS' testimony, McSPERITT tore up the check because RAY told her he wanted to give the bull to KNISS. KNISS admits that he wrote a check to RAY for $15,000, purportedly because RAY told him that in exchange for the check he would give him a credit of $70,000. According to RAY, the $70,000 credit is attributable to BERWICK'S purchase of 11 cows for $50,000 and five show calves for $20,000.

The Court finds the discrepancy in the testimony as to KNISS' payment of the $15,000 to the DEBTORS and the "credit" of $70,000 to be irrelevant. The end result is the same. KNISS made a $15,000 payment in exchange for which he received a $70,000 credit. Whether the Court accepts KNISS' explanation of the transactions or that of the DEBTORS, the accounting remains the same; the debits and credits match up even though the explanations vary.

**Extra Value Proceeds**

KNISS contends that he is entitled to receive $16,155, which represents one-half of the difference between using the contract base price for the extra value cattle and the blended rate of $1,149/head which the parties have agreed to apply to the remaining cattle sold to KNISS under the contract. Because the extra value cattle, unlike the remainder of the cattle sold to KNISS, were individually identified as they passed through the chute, the specific values set forth in the contract for each lot of cattle can be applied. According to KNISS, the contract price of the extra value cattle is $735,700, whereas the base price for the

16

cattle applying the blended rate of $1,149.29 is $703,366.21.  Focusing only on these two figures, KNISS contends that he is entitled to one-half the difference of $32,333.79, or $16,166.  KNISS argues that while the use of the blended rate makes sense in determining the "overall" price of the cattle to be paid to the DEBTORS by KNISS, the contract rate should be applied to determine his share of the extra value proceeds.

The DEBTORS contend that KNISS cannot have it both ways, applying the contract price selectively.  In fact, as the DEBTORS point out, if KNISS' share is recomputed using the contract price for the extra value cattle across the board, KNISS would come up short by approximately $3,681.68.  The following computation illustrates that point.

|  | **CONTRACT PRICE** | **BLENDED RATE** |
|---|---|---|
| 1,852  Head @ $1,149.2911 | $2,128,487.28 | $2,128,487.28 |
| 612  Head | 735,700.00 | 703,366.21 |
| 2,464  Head           Total | $2,864,187.28 | $2,831,853.49 |
|  |  |  |
| Eleven "Skinny" Cows | 12,642.20 | 12,642.20 |
| TOTAL SOLD | $2,876,829.48 | $2,844,495.69 |
|  |  |  |
| Total Sold | $2,876,829.48 | $2,844,495.69 |
| Berwick portion extra value | 236,025.00[8] | 252,191.90 |
| Kansas cows (32 @ $950) | 30,400.00 | 30,400.00 |
| Bulls | 15,000.00 | 15,000.00 |
| Berwick purchase of 11 cows | (50,000.00) | (50,000.00) |
| Berwick purchase of weaned show calves from Hawkins pasture | (20,000.00) | (20,000.00) |
| Berwick bill for feed | 43,202.20 | 43,202.20 |
|  | $3,131,456.68 | $3,115,289.79 |
|  |  |  |
| Received on or on behalf of KNISS | $3,127,775.00 | $3,127,775.00 |

---

[8] Under KNISS' theory, the DEBTORS' portion of the extra value proceeds is determined by subtracting the contract base price of $735,700 and KNISS' first cut of $61,200 (612 head @ $100/head) from the gross extra value proceeds of $1,268,950, and dividing the resulting sum of $472,050 by two.  That calculation results in the DEBTORS' share of the extra value proceeds of $236,025.

| | |
|---|---|
| Due to KNISS | $12,485.21[9] |
| Due from KNISS    $3,681.68 | |

The Court agrees with the DEBTORS. The blended rate was an agreed upon modification that applied "across the board" to all cattle purchased by KNISS. There was no agreement to allow the rate to be revisited later with respect to the extra-value cattle. Neither KNISS nor the DEBTORS may now back out of the modified agreement to use the blended rate to set the aggregate base sales price.

**CONCLUSION**

KNISS has failed to prove his claims. Based upon all of the evidence, the Court determines that a correct reconciliation yields a final amount due of $12,485.21.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[9] According to the DEBTORS' Corrected Sale Reconciliation, admitted as Defendants' Exhibit No. 1, the projected amount due KNISS was $12,507.93. At trial, McSPERITT acknowledged a minor mathematical error in computing the DEBTORS' share of the extra value proceeds, which should have been $252,191.90, rather than the $252,169.18 shown on the exhibit. As a result, the correct amount due KNISS is $12,485.21.